UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EPLET, LLC and RACER
PROPERTIES LLC,

    Plaintiffs,

v.

DTE PONTIAC NORTH, LLC and DTE
ENERGY SERVICES, INC.,

    Defendants.

_____/

Case No. 2:17-cv-11462

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [11]**

General Motors and the local southeast Michigan utility company signed a handful of 10-year agreements. But then GM filed for bankruptcy and production at a specific GM plant ceased—as did the operations of its power plant. What remains are environmental hazards and a complex dispute over the meaning and status of the agreements. The Plaintiffs are RACER Properties—a successor-in-interest to General Motors concerned with environmental issues—and Eplet—the administrative trustee of RACER. Defendants are DTE Energy Services (DTE) and its wholly owned subsidiary, DTE Pontiac North (DTEPN).

Defendants now move for partial dismissal of the Complaint. For the reasons below, the Court will grant the motion in part and deny it in part.

## BACKGROUND[1]

GM owned a facility in Pontiac, MI called the "Powerhouse," that it used to support its nearby assembly plant. In January 2007, GM entered into four agreements with DTEPN concerning the Powerhouse: an asset purchase agreement (GM sold DTEPN assets that were located at the property), a lease agreement (GM leased the land to DTEPN), a utility services agreement (DTEPN provided electricity, steam, and compressed air to GM), and an environmental indemnity agreement (DTEPN agreed to indemnify GM for claims arising from environmental laws or release of hazardous materials).[2] Concurrently, DTE Energy (DTEPN's parent company) executed a Parental Guaranty "which guarantees all of DTEPN's obligations under the Utility Services Agreement[.]" ECF 1, PgID 6, ¶ 10.

Two-and-a-half years into the agreement, however, GM filed for bankruptcy and sought to reject one of the four Associated Agreements (the Utility Services Agreement) pursuant to § 365 of the Bankruptcy Code. *Id.* at 12, ¶ 32. DTEPN objected and asked the bankruptcy court to take one of three actions: (1) deny the motion outright; (2) grant the motion "subject to the rejection of" two of the other Associated Agreements (the Asset Purchase and Lease Agreements); or (3) adjourn the motion hearing to allow the parties to "negotiate a comprehensive resolution[.]" ECF 1-3, PgID 55. Eventually the parties reached an agreement on the matter and in March 2011 the bankruptcy court entered a stipulated order ("The Stipulation"). ECF 1, PgID 13–14, ¶ 34–36; *see also*

---

[1] Because the Court is reviewing Defendants' motion under Rule 12(b)(6), the facts pled in the Complaint are presumed true and described accordingly.

[2] DTEPN calls these four agreements the "Associated Agreements," and the Court will also.

ECF 1-3 (the full stipulated order). The Stipulation established that the Utility Services Agreement, the Asset Purchase Agreement, and the Lease Agreement constituted "a single, integrated contract" and that GM was rejecting the contract, under 11 U.S.C. § 365, as of January 24, 2011.[3] ECF 1-3, PgID 55.

For the next six years, DTEPN remained in exclusive possession of the premises but failed to maintain them. The buildings have fallen into disrepair and environmental hazards have cropped up. When the lease finally expired in January 2017, DTEPN surrendered its keys to RACER, which accepted them. ECF 1, PgID 7, ¶ 16.

Plaintiffs filed suit on May 6, 2017. Defendants filed the instant motion to dismiss in lieu of an answer.

## STANDARD OF REVIEW

The Court may grant a Rule 12(b)(6) motion to dismiss if the complaint fails to allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Court views the complaint in the light most favorable to the plaintiff, presumes the truth of all well-pled factual assertions, and draws every reasonable inference in favor of the non-moving party. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true or not," then the Court must dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

---

[3] Defendants call these the "Rejected Agreements." And so will the Court.

**DISCUSSION**

There are eight counts in the Complaint: (I) breach of associated agreements, (II) breach of guaranty, (III) quantum meruit, (IV) nuisance, (V) negligence, (VI) statutory waste (MCL § 600.2919), (VII) a CERCLA claim (42 USC § 9601), and (VIII) violation of the Natural Resources and Environmental Protection Act. DTEPN moves only for the dismissal of Count I, while DTE Energy moves to dismiss all claims against it. One of DTE's overarching arguments is that Plaintiffs have not adequately pled their veil-piercing theory. Because of its potential to resolve many of the counts, the Court will first take up the veil-piercing argument, and then turn to arguments on the remaining counts.

I.  Veil Piercing and DTE's Liability

Only DTEPN and GM signed the Associated Agreements, but Plaintiffs seek to hold DTE liable under a veil-piercing theory. Plaintiffs allege that DTEPN is undercapitalized, is wholly owned by DTE, and that its membership, management, and personnel fully overlap with DTE. ECF 1, PgID 24–25, ¶ 70. DTE contends that Plaintiff failed to allege that DTE Energy used the corporate form "to commit a fraud or wrong" or that Plaintiffs have suffered an "unjust loss" resulting from abuse of the corporate form. ECF 11, PgID 129.

"Under Michigan law, there is a presumption that the corporate form will be respected" and thus the corporate veil "may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (internal citations, quotation marks,

and alterations omitted). Three requirements must be met: "(1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Id.* But the abuse of the corporate form must still be present, so the mere wrongdoing by the subsidiary does not, on its own, justify piercing the veil. *See ITT Corp. v. Borgwarner Inc.*, No. 1:05-CV-674, 2009 WL 2242904, at *9 (W.D. Mich. July 22, 2009) (distinguishing CERCLA cases in which parent companies depleted funds and acted with the purpose of avoiding liabilities); *see also Servo Kinetics*, 475 F.3d at 800 (describing the "valid proposition" that when a party chooses to contract with a subsidiary "with knowledge of the subsidiary's separate corporate existence," it "cannot later pursue the parent for the wrongs of the subsidiary.") (citing *City of Dearborn v. DLZ Corp.*, 111 F. Supp. 2d 900, 902 (E.D. Mich. 2000)).

Veil-piercing analysis is fact specific, and the facts here are telling. When GM entered into its agreement with DTEPN alone, it knew full well it was dealing with a subsidiary: part of the deal required DTE to sign a parental guaranty. *See* ECF 1, PgID 6, ¶ 10. In the Complaint, Plaintiffs make various allegations about the similarities between the Defendants, but never allege that DTE used the corporate form to avoid its obligations or to commit a fraud or wrong. Rather, the Complaint hinges on DTEPN's failure to fulfill its duties under the Associated Agreements, and Plaintiffs now wish to hold DTE accountable for those duties. The corporate veil is made of tougher cloth than this. Because Plaintiffs have failed to allege that DTE has used the corporate form to commit a fraud or wrong, they have failed to plead a veil-piercing theory of liability.

Accordingly, Counts I, III, and V will be dismissed as to DTE.

5

## II. Count I — Breach of Associated Agreements

DTEPN asserts that GM's rejection of the Associated Agreements during the bankruptcy proceedings freed them from the obligation to perform. Although DTEPN begins by conceding that the rejection "did not, by itself, result in a termination of the agreements," it argues that the rejection "qualified as a 'substantial breach' under Michigan law" which deprived DTEPN of the benefit of its bargain and thus allowed DTEPN "to rescind the Rejected Agreements and avoid any further responsibility to perform going forward." ECF 11, PgID 122–24. Plaintiffs insist that DTEPN misinterprets the Bankruptcy Code and Michigan law, and that by remaining in possession of the premises, DTEPN continued to be bound by the terms of the Associated Agreements.

### A. Bankruptcy Rejections (11 U.S.C. § 365)

Section 365 of the Bankruptcy Code governs "executory contracts and unexpired leases" entered into by the bankrupt debtor. Subject to certain exceptions, and only with the court's approval, a bankruptcy trustee may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Pursuant to subsection (g), when a trustee rejects an unexpired lease, the lease is neither terminated nor abandoned—the trustee has simply breached the terms of the lease. *In re Palace Quality Servs. Indus., Inc.*, 283 B.R. 868, 886 (Bankr. E.D. Mich. 2002) (citing *Miller v. Chateau Cmtys., Inc. (In re Miller)*, 282 F.3d 874, 877 (6th Cir. 2002)). The breach is then treated as if it "took place immediately prior to the filing of the bankruptcy petition." *In re Miller*, 282 F.3d at 877 (citing 11 U.S.C. § 365(g)(1)). As a result, the non-debtor becomes an unsecured creditor with a pre-petition claim for damages. *Id.*

6

Subsection (h) specifically concerns leases of real property. Under it, "[i]f the trustee rejects an unexpired lease of real property under which the debtor is the lessor" and "if the term of such lease has commenced" then

> the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1)(A)(ii). In essence, a non-debtor lessee is left with a choice: either "treat the lease as terminated, vacate the premises without liability for future rent, and [] assert an unsecured claim for damages resulting from the lessor's breach," or "retain possession of the property," *In re Lake Dearborn, LLC*, 534 B.R. 747, 751 (Bankr. N.D. Ill. 2015) (citations omitted), and offset from the rent "damage caused by the nonperformance after the . . . rejection," 11 U.S.C. § 365(h)(1)(B). If the lessee pursues a claim arising from the breach, the claim is adjudicated under the applicable state law. *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) (citing *In re Yasin*, 179 B.R. 43, 50 (Bkrtcy. S.D.N.Y. 1995) and reasoning that because rejection constitutes a statutory breach, but does not repudiate or terminate the contract, the parties must resort to state law to determine their rights as a result of the breach).

B. The Breach

The parties agreed that the Utility Services Agreement, Asset Purchase Agreement, and Lease Agreement "constitute[d] a single, integrated contract," and that GM rejected them all. ECF 1-3. Under § 365(g), the rejection constituted a breach by GM. Although Section 21.01(d) of the Utility Services Agreement provides that GM's

7

mere filing for bankruptcy constitutes a breach, *see* ECF 11-3, PgID 230, it makes no provision for the more specific circumstance of rejection-induced breach under § 365(g). The distinction, however, is of no consequence. Section 22.01 permits DTEPN to exercise "any and all rights available to it at law or at equity[.]" *Id.* at 232. The same would be true for the breach of the contracts that do not have a provision governing remedies. Accordingly, regardless of whether Section 22.01 of the Utility Services Agreement governs breaches pursuant to § 365(g), Michigan law—and any applicable bankruptcy law—dictated the options available to DTEPN following GM's rejection-induced breach.

Under Michigan law, when one party to a contract commits a substantial breach, the other party is excused from further compliance. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 776 (E.D. Mich. 1999). A breach is "substantial" if it "has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *Id.* Whether the non-breaching party may "rescind" the agreement or simply "terminate" it is a consequential legal distinction under Michigan law because the allowable remedies are different. *See Majestic Golf, L.L.C. v. Lake Walden Country Club, Inc.*, 297 Mich. App. 305, 323–24 (2012), *rev'd on other grounds*, 495 Mich. 909 (2013). Here though, the distinction seems to be one without a difference—as both parties conceded during oral argument. The Court finds that the more accurate term to describe DTEPN's purported action was "terminate."

In any event, there was plainly a substantial breach here. The provision of steam, air, and electricity to GM's plant, under the Utility Services Agreement, was the crux of the larger arrangement between DTEPN and GM. The Lease Agreement and Asset Purchase Agreement were necessary components of that arrangement. Accordingly, GM's breach of the three Agreements was substantial, permitting DTEPN to terminate the integrated contract. The next question is whether DTEPN did so.

C. Post-Breach Obligations

Prior to oral argument, the Court encouraged the parties to provide it with cases addressing whether DTEPN's filing of its proof of claim constituted a rescission (the term principally used in the briefing). Plaintiffs proffered *Arthur Glick Truck Sales, Inc. v. Stuphen E. Corp.*, 965 F. Supp. 2d 402 (S.D.N.Y. 2013), *aff'd sub nom. Arthur Glick Truck Sales, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 577 F. App'x 11 (2d Cir. 2014). Although the court in that case did acknowledge that it was "unable to find . . . any decision from Michigan . . . suggesting that filing of proof of claim against a bankruptcy estate is functionally tantamount to rescission of a contract with the debtor," *id.* at 407, the facts of the case are inapposite to this one. There, Party A sold fire-truck chasses to Party B, which in turn sold completed trucks to Parties C. B's sales contracts were guaranteed by Party D. When B went bankrupt, A sued D claiming it had a superior interest in the chasses. Party A made a last-ditch effort on a motion for reconsideration to claim that when D filed a proof of claim in the bankruptcy court, it implied that Parties C had rescinded their original sales contract with B. The court rejected the argument.

The facts here are much simpler, and reveal a different legal posture. When GM filed for bankruptcy and attempted to reject the Utility Services Agreement, one thing

9

became clear to DTEPN: future steam sales were unlikely. Given that the entire arrangement revolved around DTEPN providing energy services to GM, it objected to GM's singular rejection of the Utility Services Agreement, and the result was The Stipulation. Under the Bankruptcy Code, DTEPN's next step was to file a proof of claim, which it did. The proof of claim stated the exact amount being claimed and in the very same sentence stated, "[a]s a result [of GM's rejection-induced breach], DTE is excused of its obligation to perform under the Agreements (including its obligation to make the balance of Deferred Payments)[.]" ECF 1-4, PgID 60. DTEPN subsequently received a portion of its claim, ECF 1, PgID 18, ¶ 52 (citing ECF 1-5, PgID 63), and it is undisputed that neither GM nor Plaintiffs ever demanded steam, compressed air, electricity, or any other services they might be entitled to under the Utility Services Agreement.

Now, seven years after DTEPN filed its proof of claim, Plaintiffs assert that the Utility Services Agreement lives on. But the Court disagrees. The sentence in DTEPN's proof of claim accurately stated DTEPN's position under Michigan law: "[T]he Rejection constitutes a breach of the Agreements by the Debtors immediately before the Petition Date. As a result, DTE is excused of its obligation to perform under the Agreements[.]" ECF 1-4, PgID 60 (internal citation omitted); *cf. Merrill Lynch*, 67 F. Supp. 2d 764, 776 (E.D. Mich. 1999) ("'substantial breach' of a contract by one party excuses the other from compliance as well."). The breach itself excused DTEPN from performance and DTEPN evinced that the Agreement was indeed terminated both through the proof of claim and subsequent nonperformance under the Utility Services Agreement.

Plaintiffs nevertheless argue that by remaining in possession, DTEPN's obligations under the Rejected Agreements continued because the Agreements were

part of an integrated contract. While it is true—and undisputed—that the Agreements formed an integrated contract, it does not follow that anything other than the Lease Agreements necessarily lived on. Although the Court could conceivably sever the Rejected Agreements regardless of their integration, it need not do so because the Rejected Agreements themselves contemplate severance.

Once the Utility Services Agreement was terminated, Section 7.2 of the Lease Agreement kicked in. The Section, titled "Fair Market Rent," provides, in relevant part, that:

> In the event the Utility Services Agreement is terminated and Tenant elects to continue to operate the Facility under this Lease pursuant to the terms set forth in the Utility Services Agreement, then the Parties agree to immediately enter into good faith negotiation of a triple-net lease as set forth in an amendment to, or restatement of this Lease in form and substance mutually agreeable to the parties with terms that are customary for a lease of this nature between parties of equal negotiating power. . . . In the event that the Parties are unable to agree on an amendment to the terms of this Lease for this Lease to become a triple-net lease within 180 days after such election, this Lease shall terminate and be of no further force or effect.

ECF 11-2, PgID 159. Thus, by the terms of the contract, if the Utility Services Agreement was terminated, the Lease Agreement could remain in effect, albeit after renegotiation by the parties. According to Defendants, however, the negotiations required by Section 7.2 never occurred. Plaintiffs have not contested that assertion. The Lease Agreement was therefore terminated upon the expiration of 180 days.

Accordingly, Count I fails to state a claim upon which relief may be granted and the Court will therefore grant Defendants' motion as to that Count.

III.  Count II — Breach of the Parental Guaranty Agreement

11

Plaintiffs allege that DTEPN failed to perform its obligations "under the Associated Agreements, including the Utility Services Agreement" and, consequently, DTE breached the Parental Guaranty Agreement by failing to step in and perform DTEPN's obligations. ECF 1, PgID 31, ¶ 91. For relief, they demand that DTE remove "any portion of the Powerhouse and any other equipment and personal property therein owned by DTEPN or parties other than RACER" and return the property "to the same condition as was present on the Lease Commencement Date." *Id.* at 31–32, ¶ 92.

In its motion, DTE asserts that the Parental Guaranty Agreement applied only to the Utility Services Agreement, and even so, that agreement was "terminated no later than April 12, 2011" when DTE filed its proof of claim. ECF 11, PgID 125. Accordingly, DTE contends that once the Utility Services Agreement was terminated, any obligations under the Parental Guaranty ended. DTE therefore moves to dismiss Count II.

Plaintiffs counter in two ways. First, they suggest that because the Utility Services Agreement was integrated with the Lease Agreement, both agreements remained in effect when DTEPN remained in possession of the property. And second, Plaintiffs insist that even if the Utility Services Agreement was truly rescinded, the terms of the Guaranty still obligated DTE. The Court has already rejected the first argument, *supra* Section II, and will now address the second argument.

A. The Agreements

The Parental Guaranty Agreement is a short, three-page document and the only agreement to which DTE is a party. In it, DTE guaranteed to GM the "due and punctual performance of, and compliance with, all obligations, covenants, terms and conditions to be performed or complied with by DTEPN, pursuant to that certain Utility Services

Agreement between DTEPN and GM[.]" ECF 1-2, PgID 51. The agreement further confirmed that it would "remain in full force and effect until all Obligations of DTEPN have been performed in full, without regard to, and shall not be released, discharged or in any way affected by, any circumstance or condition, except as set forth herein[.]" *Id.*

The Utility Services Agreement, in contrast, is much more robust. Although it principally lays out the obligations DTEPN and GM owed to each other in the pursuit of furnishing GM's plant with energy and other resources, it also contains several sections governing the parties' obligations if circumstances change. Section 21.01 defines "Event[s] Constituting Breach by GM" and Section 22.01 lists the remedies available for a GM breach arising under 21.01. ECF 11, PgID 230, 232. *See also* 11-3, PgID 190 (explaining that an "Event Constituting Breach" has the meaning set forth in Sections 21.01 and 21.02). Notably, though, Section 21.01 does not indicate whether the "Events Constituting a Breach" is an exhaustive list, nor does Section 22.01 provide for remedies to breaches not listed in Section 21.01.[4]

Because DTE signed only the Parental Guaranty Agreement, its liability must rise and fall on that document. Unlike the other agreements at issue in the case, the Parental Guaranty does not provide for specific lease or service terms. Rather, it merely guarantees obligations. Specifically, it guarantees that if DTEPN fails to fulfill its obligations under the Utility Services Agreement, DTE will fill in the gap. It follows, then, that if DTEPN's obligations ceased, so did DTE's. *See* 38 Am. Jur. 2d Guaranty § 65 ("The guarantor's obligation ends when the debtor's obligation has been paid or otherwise satisfied.").

---

[4] The parties' briefs do not address the matter one way or another.

B. Continuing Obligations Under the Parental Guaranty Agreement

Plaintiffs argue that even if the Utility Services Agreement was rescinded (i.e., terminated), the Parental Guaranty nevertheless remained in effect because, under its terms, the Guaranty "will not terminate until the Obligations have been performed in full by DTEPN or performance has been waived by GM." ECF 1-2, PgID 51. Under the Parental Guaranty Agreement, DTE agreed to guarantee the "due and punctual performance" of DTEPN's obligations. ECF 1-2, PgID 51.

The Court has already concluded that DTEPN's obligations under the Utility Services Agreement ceased when GM breached. Even if the Parental Guaranty remained in effect, there were no longer any obligations "due" after April 12, 2011. Accordingly, DTE had no further obligations under the Parental Guaranty Agreement after that date. The Court will therefore grant the motion as to Count II, but only in part: Plaintiffs may proceed on Count II claims that arose prior to April 12, 2011, but any claims arising under the Guaranty Agreement arising after that date will be dismissed with prejudice.

IV. Counts IV, VI, VII, and VIII

Counts Four, Six, Seven, and Eight are a mixture of tort and statutory claims, but all seek to hold DTE liable through the same mechanism: § 11.11 of the Utility Services Agreement. *See* ECF 1, ¶¶ 106, 118, 136, 150. Section 11.11 falls within the portion of the Agreement covering "Environmental Matters and Responsibility" and provides that if DTEPN's Management of Hazardous Materials[5] at the Leased Premises gives rise to a

---

[5] "Management of Hazardous Materials" is collectively defined through Sections 1.01 and 11.01. ECF 11-3, PgID 192, 210.

trespass, tort liability, or an "obligation to initiate or undertake any Remediation[6] under Environmental Laws,"[7] then DTEPN must promptly take the appropriate action "at its sole cost and expense[.]" ECF 11-3, PgID 209, 219.

DTE points out that according to the Complaint, DTEPN had exclusive possession and control over the leased premises. And Counts IV, VI, VII, and VIII describe only the alleged misconduct of DTEPN. Absent veil piercing, therefore, DTE argues that the Complaint must state that DTE is liable for separate reasons than DTEPN.

That point might be true absent the Parental Guaranty. But unlike Counts I, III, and V—which allege liability merely on the grounds of veil piercing—Counts IV, VI, VII, and VIII rely on Section 11.11. Accordingly, if Plaintiffs prevail in showing that DTEPN committed the torts and stautory violations alleged in those counts, DTE can be held liable under Section 11.11. But because DTE's obligations under the Parental Guaranty Agreement ceased, at the latest, on April 12, 2011, Plaintiffs' claims against DTE arising under Counts IV, VI, VII, and VIII are limited to claims that arose prior to that date. The Court will therefore grant DTE's motion in part, and deny it in part as to those counts.

Plaintiffs may therefore proceed on the following claims:

- Count II: against DTE for claims arising before April 12, 2011;
- Count III: against DTEPN only;
- Counts IV, VII, and VIII: against DTEPN as pled, but against DTE only for claims arising before April 12, 2011; and
- Count V: against DTEPN only.

---

[6] "Remediation" is defined in Section 11.01. ECF 11-3, PgID 210.
[7] "Environmental Law" is defined in Section 1.01. ECF 11-3, PgID 189.

15

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendants' Motion to Dismiss [11] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Count I is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Counts III and V are **DISMISSED WITH PREJUDICE** as to Defendant DTE Energy Services, Inc. only.

**IT IS FURTHER ORDERED** that Counts II, IV, VI, VII, and VIII are **PARTIALLY DISMISSED WITH PREJUDICE** to the extent explained in this Opinion.

**IT IS FURTHER ORDERED** that pursuant to Rule 12(a)(4)(A), Defendants shall **FILE** any responsive pleadings no later than 14 days from the date of this Order.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: March 23, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 23, 2018, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager