# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (SOUTHERN DIVISION)

RACER PROPERTIES LLC, and
EPLET, LLC,

        Plaintiffs,

v.

DTE PONTIAC NORTH, LLC, and
DTE ENERGY SERVICES, INC.,

        Defendants.

Case No. 2:17-cv-11462-SJM-RSW
Hon. Stephen J. Murphy, III
Hon. Magistrate R. Steven Whalen

---

## <u>AMENDED COMPLAINT</u>

Plaintiffs RACER Properties LLC, a Delaware limited liability company ("RACER Properties"), and EPLET, LLC ("EPLET"), a Delaware limited liability company, as environmental response trust administrative trustee for the Revitalizing Auto Communities Environmental Response Trust ("RACER Trust"), a trust formed under the laws of the State of New York (RACER Properties and RACER Trust may hereinafter be together referred to from time to time as "RACER"), by their attorneys, Dawda, Mann, Mulcahy & Sadler, PLC and Thompson & Knight LLP, for their Complaint against Defendants DTE Pontiac North, LLC, a Michigan limited liability company, and DTE Energy Services, Inc., a Michigan corporation, state as follows:

## BACKGROUND

1.      RACER Trust, an environmental response trust and a successor for expressly limited purposes to Motors Liquidation Company, f/k/a General Motors Corp. ("GM"), to certain real and personal property which is the subject of this Complaint, commences this action seeking money damages against DTE Pontiac North, LLC ("DTEPN") and its parent and guarantor DTE Energy Services, Inc. ("DTE Energy") based upon the Defendants' failure to comply with various contracts pursuant to which they agreed to be financially responsible for certain maintenance, cleanup and remediation obligations arising out of their use and occupancy of the property, including environmental conditions and hazardous materials, at a power plant facility owned, leased, and formerly operated by DTEPN in Pontiac, Michigan.[1]  Instead of complying with its clear contractual and financial obligations, DTEPN, over a period of ten years and through a pattern of neglect and waste, allowed the Leased Premises (as hereafter defined) and the Powerhouse (as hereafter defined) located thereon to fall into a severe state of disrepair permitting, among other things, the unabated release and/or threatened release of hazardous materials harming the environment and potentially those who come in contact with

---

[1] DTEPN and DTE Energy are hereafter together referred to as the "Defendants."

2

the Leased Premises.  The Defendants' wrongfully seek to skirt their responsibilities and shift the cost of maintenance, cleanup, and remediation to RACER.[2]

## PARTIES

A.   Plaintiffs

2.   Plaintiff RACER Properties is a Delaware limited liability company, and is wholly owned by RACER Trust.  RACER Properties' principal place of business is in Michigan.

3.   Plaintiff EPLET, LLC, as environmental response trust administrative trustee of RACER Trust, is a Delaware limited liability company.  The sole member of EPLET is Elliott P. Laws, a resident of the Commonwealth of Virginia.  EPLET serves as the Administrative Trustee of the RACER Trust.  EPLET's principal place of business is the District of Columbia.

4.   RACER Trust was at its creation the largest environmental response trust in United States history.  The Trust was formed pursuant to an Environmental Response Trust Consent Decree and Settlement Agreement (the "Consent Decree") between and among, *inter alia*, the United States government and certain state government attorneys general and environmental agencies.  The Consent Decree was annexed and incorporated into the plan of reorganization in the GM Bankruptcy

---

[2] Capitalized but undefined terms in this Complaint shall have the meaning ascribed to such items in the Associated Agreements (as hereafter defined).

Case[3] (the "Plan"), which was confirmed on March 29, 2011 by order of the bankruptcy court ("Confirmation Order"). [Bankr. Dkt. 9941].

5.     The Consent Decree was an agreement among GM and its affiliated Chapter 11 debtors, the United States on behalf of the Environmental Protection Agency (the "EPA"), various States or States' attorneys general and environmental agencies, and the Saint Regis Mohawk Tribe, which such Consent Decree was incorporated into the Confirmed Plan and Confirmation Order. RACER Trust was expressly created to cleanup and position for redevelopment certain industrial plants and other properties (the "Trust Properties") formerly owned by GM. Pursuant to the Plan and Confirmation Order, the Trust Properties were transferred to the RACER Trust on March 31, 2011.

6.     The RACER Trust was funded by the United States Treasury with Troubled Assets Relief Program (or TARP) money. Pursuant to the Plan and Consent Decree, GM "shall have no further liability, role, or residual interest with respect to the Environmental Response Trust or the Environmental Response Trust Properties." [Consent Decree, Bankr. Dkt. 9836, ¶ 30; Plan, Bankr. Dkt. 9836, pp. 48-49; GM Disclosure Statement, Bankr. Dkt. 8023, p. 84]. The Consent Decree designates the United States Government as the Trust's sole beneficiary. As such,

---

[3] *In re General Motors Corp*., 09-50026 ("GM Bankruptcy Case"). All references to filings in GM's Bankruptcy Case are public filings and extremely voluminous and are referenced herein as "Bankr. Dkt."

RACER has no responsibilities to GM or its creditors.  **In other words, GM is not RACER, and RACER is not GM.**

7.     One of the Trust Properties, which is the real property at issue in this matter, is located in the City of Pontiac, County of Oakland, State of Michigan, and includes land and certain easements as more particularly described in the Lease Agreement between the parties (the "Property" or "Leased Premises").  The Leased Premises was conveyed by GM to RACER Properties because under Michigan law, absent compliance with certain requirements, a foreign trust is not permitted to hold title to real estate.

B.    <u>Defendants</u>

8.     Defendant DTEPN is a Michigan limited liability company, which has its principal place of business in Michigan.  DTEPN is a wholly-owned subsidiary of defendant DTE Energy.

9.     Defendant DTE Energy is a Michigan corporation, which has a principal place of business in Michigan.

## JURISDICTION AND VENUE

10.     This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332(a)(1) because the action arises under the laws of the United States and is a civil action between a citizen of a state and a citizen of a foreign state, and the matter in controversy in this action exceeds the sum of $75,000.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), (b)(2) and (c)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and the Leased Premises are located, in the Eastern District of Michigan.

## FACTUAL BACKGROUND

12.    On or about January 10, 2007, GM and DTEPN entered into several agreements concerning the Leased Premises and assets located therein or thereon, including without limitation a Lease Agreement, Utility Services Agreement, and Asset Purchase Agreement (collectively, the "Associated Agreements"), as more fully detailed at Paragraphs 14-33.   GM and DTEPN are also parties to an Environmental Indemnity Agreement.

13.    In connection with the foregoing, DTE Energy executed a Parental Guaranty (the "Guaranty"), which guarantees all of DTEPN's obligations under the Utility Services Agreement, which, in turn, incorporates some or all of the provisions of the Environmental Indemnity Agreement.

## THE LEASE

14.    Under the Lease, GM, as landlord, leased the Leased Premises to DTEPN, as tenant.  See Lease, Exhibit A.

15.    Between approximately January 10, 2007, and January 10, 2017, DTEPN was the tenant in continuous possession and occupancy of the Leased

Premises and the exclusive owner and user of certain assets located therein or thereon.  During at least a portion of its tenancy, DTEPN operated such assets to provide steam, electricity, and compressed air to the neighboring GM manufacturing facilities known as the Pontiac North Manufacturing Complex (the "Plant").  The majority of the Plant operations ceased in or around 2011.

16.     Under § 5.3 of the Lease, DTEPN was required, at its expense, to comply promptly with all Applicable Laws (as defined in the Lease) in effect during the term, or any part of the term, regulating DTEPN's use of the Leased Premises, including all regulations of any governmental authority addressing applicable law and employee health and safety.  See Lease, § 5.3, Exhibit A.

17.     Further, DTEPN was prohibited from committing or suffering any waste upon the Leased Premises and the Easements (together defined in the Lease as the "Site").  DTEPN was required to take such action as may be reasonably necessary to prevent or terminate any such waste arising out of DTEPN's use and occupation of the Leased Premises.  See Lease, § 5.5, Exhibit A.

18.     Section 5.4 of the Lease provides in part:

> [DTEPN,], at [DTEPN's] expense, shall keep in good order, condition and repair, casualty and reasonable wear and tear excepted, the Facility and the Lease Premises, and all Utilities facilities, systems and improvements constructed thereon and therein from the boundary of the Leased Premises to the Facility….

See Lease, §5.4, Exhibit A.

7

19.     The stated term of the Lease expired on January 10, 2017, at which time DTEPN sought to surrender the Lease in its existing condition by providing the keys to the Leased Premises to RACER. RACER accepted the keys, but reserved its rights to: (i) contend that the Lease was not properly surrendered to RACER; and (ii) any and all damages to which RACER was entitled.

20.     Section 6.4 of the Lease applies to the surrender of the Site to RACER upon the termination of the Lease and provides:

> Subject to [DTEPN's] right to remove the Facility or any portion thereof, upon the termination of this Lease, **[DTEPN] shall surrender the Site to [RACER] in the same condition as was present on the Commencement Date, casualty, and ordinary wear and tear excepted.   Within 90 days following any termination of this Lease (such period of time shall not be considered a holdover, the Fair Market Rent shall not be applied during such a period of time), [DTEPN] shall remove from the Site any portion of the Facility and any other equipment and personal property owned by [DTEPN] or parties other than [RACER]**.  During such ninety day period, rent shall apply in the following manner: (a) during the first 30 days of such ninety day period, the rent shall continue as set forth in this Lease, and (b) for the balance of such period, the rent shall be in the amount of $3,500.00 per 30 day period.  Any portion of the Facility or other equipment or personal property not so removed shall be the property of [RACER] and [RACER] may thereafter do with such property as [it] sees fit at [RACER's] sole cost and expense.  **The provisions of this Section 6.4 shall survive the termination of this Lease**. (emphasis added.)

See Lease, §6.4, Exhibit A.

21.     "Facility" as defined in the Associated Agreements, and referred to herein as the "Powerhouse", includes those assets purchased by DTEPN under the

8

Asset Purchase Agreement (as hereafter defined), including among other things, the building structures as more particularly defined in Exhibit A to the Asset Purchase Agreement.  See Asset Purchase Agreement, §§ 1.1, 2.1 and Exhibit A to Asset Purchase Agreement, Exhibit B.

22.    Under §15.1 of the Lease, RACER has the right to enter the Leased Premises, at reasonable times and after reasonable prior notice to DTEPN, to inspect the Leased Premises to determine if DTEPN is observing the covenants and agreements of the Lease.  See Lease, §15.1, Exhibit A.

23.    The terms of and obligations of DTEPN under the Lease survive termination.  Additionally, termination of the Lease neither releases the parties from any obligations incurred prior to the termination, nor waives any rights or remedies with respect to a breach of the Lease giving rise to such termination.  See Lease, §§ 6.4 and 14.5, Exhibit A.  Thus, even if DTEPN was a holdover, § 17.13 provides:

> **and such month to month tenancy shall be subject to every other term, covenant and condition contained in this Lease**. (emphasis supplied).

24.    The prevailing party in an action or suit against the other party is entitled to reimbursement from the non-prevailing party for all costs and expenses, including reasonable attorney fees, associated therewith.  See Lease, §17.2, Exhibit A.

## THE ASSET PURCHASE AGREEMENT

25.     Under the Asset Purchase Agreement, DTEPN purchased certain utility assets from GM (referred to in the Asset Purchase Agreement as the "Facility" and referred to herein as the "Powerhouse"), which included among other things, the building structure, a coal-fired boiler, a circulating fluidized bed boiler, natural gas boilers, air compressors, fuel handling systems, a steam turbine, and power generating equipment as more particularly defined in Exhibit A to the Asset Purchase Agreement.  See Asset Purchase Agreement, §§ 1.1, 2.1 and Exhibit A of the Asset Purchase Agreement, Exhibit B.

## THE UTILITY SERVICES AGREEMENT

26.     On or about January 10, 2007, concurrent with execution of the Lease, GM and DTEPN also entered into a Utility Services Agreement.  See Utility Services Agreement, Exhibit C.

27.     Under the Utility Service Agreement, DTEPN is required to maintain and repair the Powerhouse in accordance with an express schedule of "Facility Maintenance."  See Utility Services Agreement, §§ 1.01, 3.01, 4.01, Exhibit C. DTEPN is solely responsible for the Facility Maintenance and the operation, repair, and maintenance of the Powerhouse in accordance with "Prudent Industry Standards" (as defined in the Utility Services Agreement).  See Utility Services Agreement, §§1.01, 3.04, 4.01, Exhibit C.

10

28.     The Utility Services Agreement also imposes certain obligations upon DTEPN with respect to Environmental Hazards and Environmental Conditions at the Leased Premises.

29.     Section 11.07(j) of the Utility Services Agreement provides, in part:

> DTEPN will, subject to the terms of this Agreement, (i) comply with all applicable Environmental Laws covering DTEPN's operations on the Leased Premises…

<u>See</u> Utility Services Agreement, <u>Exhibit C</u>.

30.     Section 11.11 of the Utility Service Agreement provides:

> Section 11.11. DTEPN's Obligation To Respond. Without limitation upon the Parties' respective obligations under this Article XI or the Environmental Indemnity Agreement, if DTEPN's Management of Hazardous Materials at the Leased Premises (i) gives rise to liability or to a Claim under any Environmental Laws or any common law theory of tort or otherwise; (ii) gives rise to an obligation to initiate or undertake any Remediation under any Environmental Laws; or (iii) creates a nuisance or trespass, then, in any such event, DTEPN shall, at its sole cost and expense, promptly take all applicable Remediation or other action so as to comply in all material respects with all approvable Environmental Laws and otherwise reasonably address any liability or Claim with respect thereto.

<u>See</u> Utility Services Agreement, <u>Exhibit C</u>.

31.     Section 11.12 of the Utility Service Agreement provides:

> Section 11.12. Environmental Indemnity Obligations. Each of the Parties hereby acknowledges and agrees that its exclusive remedies in respect of any Claim or Loss in relation to Environmental Conditions, Environmental Laws, Environmental Noncompliance or Hazardous

> Materials shall be as set forth in the Environmental
> Indemnity Agreement.

<u>See</u> Utility Services Agreement, <u>Exhibit C</u>.

32.     The Utility Services Agreement also permitted DTEPN to sell utility

services to third parties. See Utility Services Agreement, § 2.02 , <u>Exhibit C</u>.

33.     The Utility Services Agreement was the document among the

Associated Agreements providing for maintenance and remediation of the Leased

Premises, which would ordinarily have been included in the Lease, but for the fact

that the parties decided to use separate documents only for "organizational

convenience." <u>See</u> § 35.01 of the Utility Services Agreement, <u>Exhibit C</u>.

## <u>THE ENVIRONMENTAL INDEMNITY AGREEMENT</u>

34.     Section 4.2 of the Environmental Indemnity Agreement provides:

> Section 4.2 DTEPN's Indemnity.   DTEPN shall
> indemnify, and hold GM, its Affiliates and their respective
> managers, officers, directors, employees (each a "GM
> Party") harmless from and against any and all liabilities,
> costs, damages, penalties, orders, complaints or fines
> (including, costs of Remediation and reasonable
> attorneys' fees…)  which arise from any Claims, to the
> extent any such Claim is made or brought against a GM
> Party, or which are reasonably incurred by a GM Party,
> pursuant to Section 4.4 below, to comply with
> Environmental Law or respond to an imminent threat of
> harm to human health or the environment, and which in
> each case relate to: (i) any Release of a Regulated
> Substance at, in, or under or in the vicinity of the Project
> Site caused by a DTEPN Party or by DTEPN's operations
> or activates, that occurs subsequent to the Effective Date;
> (ii) any contribution to or exacerbation by a DTEPN Party
> of an Existing Environmental Condition; provided that the

mere discovery of an Existing Environmental Condition shall not constitute contribution to exacerbation of such condition; …(v) a violation of Environmental Law caused by DTEPN's operations at the Facility which occurs after the Effective Date of the Utility Services Agreement; and (vi) any other matter listed in Section 20.04 of the Utility Services Agreement and Section 9.6 of the Asset Purchase Agreement.

See Environmental Indemnity Agreement, Exhibit D.

## THE PARENTAL GUARANTY

35.     Under the Guaranty, DTE Energy unconditionally and irrevocably guaranteed the performance of, and the compliance with, all Obligations (as defined therein), covenants, terms, and conditions to be performed or complied with by DTEPN, pursuant to the Utility Services Agreement.  See Guaranty, ¶ 1, Exhibit E.

## THE GM BANKRUPTCY CASE

36.     GM filed for bankruptcy protection on June 1, 2009, in the United States Bankruptcy Court for the Southern District of New York (Case No. 09-50026) (the "GM Bankruptcy Case").

37.     On January 7, 2011, GM filed a motion (the "Rejection Motion") in the GM Bankruptcy Case, seeking to reject the Utility Services Agreement pursuant to § 365 of the Bankruptcy Code.

38.     DTEPN filed an objection ("DTEPN Objection") with the Bankruptcy Court to the Rejection Motion, asserting that GM could not reject only the Utility Services Agreement, because the Associated Agreements (which included the Utility

Services Agreement) formed a single unified contract which could only be rejected together.

39.     The foregoing is also consistent with the written agreements among the parties as set forth at paragraphs 14 through 35 of the Complaint, and as annexed hereto as Exhibits.

40.     On or about March 1, 2011, GM and DTEPN entered into a stipulation, which was approved by the Bankruptcy Court, resolving the Rejection Motion and DTEPN Objection and: (a) providing that the Associated Agreements constitute a single, integrated contract; and (b) authorizing the rejection of the Associated Agreements, consisting of the Lease, Utility Services Agreement, and Asset Purchase Agreement.   See Stipulation and Agreed Order Regarding Debtors' Rejection of Certain Executory Contracts with DTEPN (the "Rejection Stipulation and Order"), Exhibit F.

41.     Pursuant to the Rejection Stipulation and Order, GM and DTEPN also stipulated as follows in the GM Bankruptcy:

> Neither the timing of the Rejection or any other provision herein shall prejudice in any way DTE's [i.e., DTEPN's] rights, if any, under subsection 365(h) of the Bankruptcy Code in respect of the Lease Agreement arising as a result of the Rejection, *provided however*, that the Parties reserve all rights with respect to the impact of exercising 365(h) rights on the rights and obligations of the Parties under the integrated Utilities Services Agreement, Asset Purchase Agreement and Lease Agreement. [Emphasis in the original].

14

<u>See</u> Rejection Stipulation and Order, <u>Exhibit F</u>.

42.    On March 29, 2011, the Bankruptcy Court entered the Confirmation Order confirming the Confirmed Plan which incorporated the terms of the Consent Decree.

43.    Pursuant to the Confirmed Plan, Confirmation Order, and Consent Decree, GM transferred all of its interests in, and ownership of the Trust Properties to RACER as a successor-in-interest to GM, which included the Leased Premises.

44.    On March 31, 2011, the Leased Premises, together with certain fixtures and/or personal property owned by GM within the Powerhouse, along with all claims and interests with respect to the Leased Premises, were transferred from GM to RACER.  DTEPN and DTE Energy had notice of such transfer.

45.    The Powerhouse (or "Facility" as defined in the Associated Agreements) was not transferred, assigned, or sold to RACER and remained the property of DTEPN.  Within 90 days of the termination of the Lease, DTEPN was obligated to remove the Facility and other equipment and personal property owned by DTEPN, or parties other than RACER, from the Site.

**<u>DTEPN'S & DTE ENERGY'S CONTINUED RETENTION OF THE BENEFITS OF THE ASSOCIATED AGREEMENTS FOLLOWING THEIR REJECTION IN THE GM BANKRUPTCY</u>**

46.    Section 21.01 of the Utility Services Agreement provides that it shall be a default if GM "fails to perform any of its material duties or obligations

contemplated by this agreement and such failure continues and is not cured within thirty (30) calendar days after written notice is received from DTEPN."  In other words, to be able to assert any remedies arising out of a breach, DTEPN was required to give written notice of the breach with right to cure.  Utility Services Agreement, § 21.01, Exhibit C.

47.     At no time following rejection of the Associated Agreements, did DTEPN give any notice of breach and demand to cure, which was a prerequisite for DTEPN to exercise any action or remedy on account of a breach.  Utility Services Agreement, § 22.01, Exhibit C.

48.     At no time following rejection, did DTEPN terminate or provide any notice to RACER that it was terminating any of the Associated Agreements.

49.     Under the Utility Services Agreement, DTEPN had the right to sell utility services to companies other than GM.  Subsequent to rejection of the Utility Services Agreement, DTEPN and DTE Energy sought to convert the Powerhouse to a solar or biomass facility so that, consistent with its rights under the Utility Services Agreement, it could sell utility services to third parties.  Thus, DTEPN's actions were wholly inconsistent with its current position that it had terminated the Utility Services Agreement after rejection of the Associated Agreements.

50.     Under the Utility Services Agreement and Asset Purchase Agreement, DTEPN had the right to sell the Powerhouse itself.  Subsequent to the rejection of

the Associated Agreements, DTEPN and DTE Energy sought to sell the Powerhouse to third parties.

51.     DTEPN and DTE Energy chose to remain in the possession of the Leased Premises after the rejection of the Associated Agreements in the GM Bankruptcy.  In fact, DTEPN and DTE Energy remained in sole and exclusive possession for over six and a half years through approximately January 10, 2017. DTEPN never sought to terminate the Associated Agreements, and never served any notices of default or termination upon GM or RACER as its successor.

52.     In fact, during the term of the Lease, DTEPN, solely through representatives of DTE Energy, represented to Plaintiffs and third parties (including regulatory agencies) that the Lease remained in effect.  See December 2016 MDEQ Air Quality Division, Activity Report ("MDEQ Report"), Exhibit G.

53.     After the stipulated rejection of the Associated Agreements, DTEPN at the direction of DTE Energy not only continued to possess the Leased Premises, it renewed and obtained various Environmental Permits in 2012, 2013 and 2016, as reflected in the MDEQ Report.  See Exhibit G.

54.     Additionally, the Renewal Operating Permit and other permits (including the storm water and air permits) referred to in the MDEQ Report are actions and responsibilities that DTEPN was required to maintain pursuant to §§ 8.01, 11 and Schedule 16 of the UTSA.  Moreover, these Environmental Permits (as

17

defined in the UTSA) were required to be transferred to RACER by DTEPN at the end of the term of the Lease.  See email dated October 25, 2016 from Douglas R. Cash of DTE Energy (attached as Exhibit H) regarding his request to either cancel or transfer the Storm Water Permit and Air Permit "concurrent with the end of the Lease Term January 10, 2017."  The foregoing is evidence of and an admission that Defendants were acting as tenants of the Property through the end of the Lease term (January 10, 2017).

55.    By DTEPN's and DTE Energy's election to remain in possession DTEPN waived any post-rejection breach by landlord.

56.    As a result of its election to remain in possession of the Leased Premises, DTEPN and DTE Energy continued to reap the benefits of the Associated Agreements.  During the six years since rejection, DTEPN and DTE Energy have exclusively occupied and maintained personnel at the Property, limited RACER's access to the Leased Premises, and referred to and represented to RACER and third-parties that the Leased Premises as its (i.e. DTEPN's and DTE Energy's) leased property and that it controlled the rights to the Leased Premises and Powerhouse. DTEPN and DTE Energy also marketed the Leased Premises and Powerhouse for a potential sale, to provide power to third-parties, and/or to convert the Powerhouse to a bio-mass or solar facility. DTEPN and/or DTE Energy, subsequent to rejection,

made inquiries to RACER concerning, the foregoing. Some of the emails from DTE Energy reflecting the foregoing are annexed hereto as <u>Exhibit H</u>.

57.     Since title to the Leased Premises (exclusive of the Powerhouse) vested in RACER, DTEPN solely through representatives of DTE Energy has held DTEPN out as the tenant of RACER pursuant to the Lease.

58.     Additionally, as a result of exercising its right to remain in possession of the Leased Premises, DTEPN and DTE Energy were obligated to maintain the Leased Premises and Powerhouse.

59.     At the direction of DTE Energy, though DTEPN elected to remain in exclusive possession of the Leased Premises and the Powerhouse for the term of the Lease and through January 10, 2017, DTEPN and DTE Energy failed to maintain the Leased Premises and Powerhouse during such possession, and the operational condition of the Powerhouse and overall condition of the Leased Premises has severely deteriorated, resulting in substantial costs and damages to RACER.

## <u>DTEPN'S PROOF OF CLAIM IN THE GM BANKRUPTCY</u>

60.     On March 31, 2011, DTEPN filed a Proof of Claim with the Claims Agent appointed in the GM Bankruptcy Case for damages allegedly sustained by DTEPN because of the rejection of the Associated Agreements. <u>See</u> DTEPN Proof of Claim, <u>Exhibit I</u>.  DTEPN's Proof of Claim was in the amount of "not less than $4,993,680 (plus attorneys' fees)", alleging certain identified "damages" resulting

from the rejection of the Associated Agreements, including but not limited to, the "lay-up costs/mothballing the [Powerhouse], inclusive of labor", and "[Powerhouse] restart costs." DTEPN's proof of claim acknowledged its maintenance, cleanup, and remediation obligations under the Utility Services Agreement in its Proof of Claim because it sought damages for the obligations imposed on it under the Utility Services Agreement, including the removal of asbestos from certain identified assets, and "accelerated degradation" of various fixtures/personal property. *Id*.

61. The Proof of Claim actually sought for DTEPN to receive a distribution from the GM bankruptcy estate for the costs that DTEPN would incur **in the future** to RACER under both the Lease and Utility Services Agreement for cleanup of the Leased Premises and Powerhouse at the expiration of the Lease in January 2017, and return them in the same condition as at the Lease commencement.

62. All claims against GM and its estate were administered by the Motors Liquidation Company General Unsecured Creditors Trust ("GUC Trust"), which was formed and created pursuant to the Plan and Confirmation Order. See Plan, at Articles 4.3 and 6.2 [Bankr. Dkt. 9836, pp. 27-30 and 40-45].

63. Plaintiffs had and have no connection with the GUC Trust, GM's bankruptcy, or its creditors. Since March 31, 2011, RACER's purpose was to administer through the RACER Trust the Trust Properties (and associated assets) that had been owned by GM and transferred to, in this case, Plaintiff RACER

Properties, separate and apart from GM, its estate and creditors.  Neither GM nor its creditors are entitled to receive any distribution from RACER.

64.    The submission of the Proof of Claim to the Claims Agent did not provide notice of termination of the Utility Services Agreement or Lease to RACER or to Plaintiff EPLET.

65.    The Proof of Claim was never served upon RACER.

66.    In fact, the Bankruptcy Court's order (the "Confirmation Order") confirming the Plan contains a specific provision (Bankr. Dkt. 9941, pp. 71-72), addressing when notice is effective against RACER and EPLET. Specifically, the Confirmation Order provides:

> **To be effective**, all notices, requests, and demands to or upon …[EPLET] … shall be in writing…, addressed as follows:
>
> ***
>
> Elliott P. Laws, Esq.
> 1001 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2595,
> Telephone: (202) 624-2798,
> Telecopier: (202) 628-5116.

67.    On or about March 7, 2012, the GUC Trust and DTEPN entered into a stipulation ("Stipulation") regarding DTEPN's Proof of Claim, wherein the parties agreed that DTEPN's Proof of Claim would be allowed in the amount of $3,300,000. See Stipulation re: Proof of Claim, Exhibit J.  The Stipulation was not served upon Plaintiffs.

21

68.     Upon information and belief, DTEPN has received actual value on its allowed Proof of Claim, in the amount of $3,300,000, which included a monetary distribution with respect to certain maintenance, cleanup, remediation, and "lay up" obligations it would incur at termination of the Associated Agreements, including the Utility Services Agreement.   However, DTEPN has never performed the obligations it acknowledged and was compensated for under the Proof of Claim and now improperly seeks to disregard those obligations without compensation to RACER or repayment of its funded Proof of Claim.

## CURRENT CONDITION OF THE POWERHOUSE AND LEASED PREMISES

69.     In June 2016, after a request by RACER, DTEPN granted RACER restricted access to the Leased Premises for the sole purpose of evaluating the condition of the Powerhouse.  At the time of the limited inspection, DTEPN required RACER to follow and/or abide by DTEPN's safety rules and procedures while on the Leased Premises.  See June 20, 2016, Access and Indemnity Agreement, Exhibit K.

70.     On or around June 20, 2016, RACER and its consultant, accompanied by employees and/or agents of DTEPN and DTE Energy, were permitted access to only limited portions of the Leased Premises and Powerhouse.  DTEPN and DTE Energy, through their agents and/or employees, refused and/or improperly limited access to certain other portions of the Leased Premises and Powerhouse in violation

22

of the Associated Agreements citing its environmental concerns to RACER regarding the current condition of the Powerhouse (e.g., the building structures) and Leased Premises and the contamination from the release and threatened releases of friable asbestos in or about the Powerhouse. During the June 20, 2016, inspection (and again during a January 4, 2017, truncated inspection of the Powerhouse), RACER observed sheets of paint and paint chips and also what appeared to be asbestos-containing material that have fallen from the walls/ceiling and equipment onto the floor of the Powerhouse. RACER believes the peeling paint contains lead.

71.     Prior to and after the inspection of June 20, 2016, RACER communicated its concerns to DTEPN and DTE Energy that there are and have been releases and threatened releases of hazardous materials and/or substances at the Leased Premises and/or Powerhouse as a result of their actions or inaction during their exclusive use and possession of the Leased Premises and ownership and operation of the Powerhouse, which are unsafe and may constitute an imminent threat of harm to human health, safety, and the environment and are in violation of applicable laws.

72.     Prior to January 10, 2017, RACER requested, orally and in writing, that DTEPN and DTE Energy provide RACER's agents and consultants access and entry to the Leased Premises and Powerhouse for the primary purpose of inspection in

advance of the expiration of the Lease.  See December 9, 2016 Correspondence, Exhibit L.

73.     In response, DTEPN and DTE Energy denied RACER full access and entry to the Leased Premises and the Powerhouse.  Instead, DTEPN and DTE Energy improperly limited RACER's access/entry onto the Leased Premises and into the Powerhouse to certain portions thereof, and conditioned entry upon the execution of a certain Access and Indemnity Agreement.  DTEPN's conduct was in violation of the Associated Agreements, including the Lease Agreement.  See Email communications dated January 3, 2017, Exhibit M.

74.     On or about January 3, 2017, RACER executed a certain Access and Indemnity Agreement, as improperly demanded by DTEPN, and signed by Douglas Cash, who is a Director of Assets of DTE Energy, and gained limited access and entry to the Leased Premises and Powerhouse on January 4, 2017.  See January 3, 2017 Access and Indemnity Agreement, Exhibit N.

75.     On January 6, 2017, RACER made written demand on DTEPN and DTE Energy to perform its obligations under the Associated Agreements, including the Utility Services Agreement.  See January 6, 2017 correspondence, Exhibit O.

76.     On January 6, 2017, RACER made written demand on DTE Energy to perform its obligations under the Guaranty.  See January 6, 2017 correspondence, Exhibit O.

77.     On January 10, 2017, DTEPN and DTE Energy vacated and purported to surrender the Site to RACER "as is," leaving behind and abandoning the remaining portions of the deteriorating Powerhouse at the Leased Premises, including those portions of the Powerhouse that have been and are continuing to be contaminated and/or exacerbated, or threatened with contamination, by the disposal, discharge, spilling, dumping, abandonment, release, and/or threatened release of lead paint, friable asbestos, and other hazardous materials.

78.     After DTEPN and DTE Energy vacated the Site and abandoned the Powerhouse, RACER and its consultant inspected portions of the Leased Premises and Powerhouse on January 11, 12, 13, and 17, 2017.  The truncated inspection revealed that the older, eastern portions of the Powerhouse building containing boilers 6, 7, and 8 are in a severely deteriorated condition, including significant roof failure and broken and missing window panes, which has allowed the entry of significant volumes of water that have severely damaged other building components and equipment.  As a result of the water intrusion, asbestos-containing materials consisting of asbestos-containing piping and equipment insulation have separated from almost every surface in the eastern section and are lying in a water-saturated condition on the floor.  In addition to the asbestos-containing materials, water, ice, and lead paint chips cover the floors, and subsurface structures also contain wastewater and sludges.

79.    As a result of DTEPN's and DTE Energy's refusal and/or improper limitation of RACER's access and entry onto the Leased Premises and into the Powerhouse, DTEPN improperly delayed and/or prohibited RACER from investigating the presence of environmental contaminants and hazardous substances, and from determining the overall condition of the Leased Premises and Powerhouse, while it remained in exclusive use, occupancy, and possession of the Leased Premises and Powerhouse, which was owned by DTEPN.

80.    Within ninety (90) days from the termination of the Lease, DTEPN was required to "remove from the Site [the Leased Premises and Easements] any portions of the [Powerhouse] and other equipment and personal property owned by tenant [DTEPN] or parties other than the Landlord [RACER]."  See Lease, § 6.4, Exhibit A.

81.    DTEPN and DTE Energy failed to restore the Site to the "same condition as was present on the Commencement Date [of the Lease], casualty, and ordinary wear excepted," as required under § 6.4 and § 5.4 of the Lease prior to vacating the Leased Premises on January 10, 2017, claiming that it has no duty to perform under the Associated Agreements (including the Lease).

82.    By leaving behind portions of the Powerhouse and any other equipment and personal property owned by DTEPN or parties other than RACER, DTEPN is in direct breach of its express obligations under the Associated Agreements.

DTEPN's actions, which were actually taken by or at the direction of DTE Energy, also contradict its obligations under the allowed Proof of Claim in the GM Bankruptcy, wherein DTEPN sought damages and received funds for the lay-up costs/mothballing and restart costs of the Powerhouse, the removal of boilers 1, 2, 3, and 5, the removal of other non-DTEPN owned equipment, the removal of asbestos from certain identified assets, and the "accelerated degradation" of various fixtures and personal property at the Powerhouse.

83.     On several occasions, RACER has requested and demanded that DTEPN and DTE Energy perform their obligations under the Associated Agreements and DTEPN and DTE Energy have refused.

84.     Despite having received value for its Proof of Claim in the GM Bankruptcy, DTEPN and DTE Energy have performed only minimal or no maintenance of the Powerhouse and the identified equipment, rendering such assets worthless and substantially increasing RACER's costs for removal and/or disposal, which are the obligations of DTEPN and DTE Energy under the Associated Agreements and Guaranty.

85.     Upon information and belief, all funds received by DTEPN were distributed or otherwise paid to DTE Energy.

## ALTER EGO AND PIERCING THE VEIL OF
## LIMITED LIABILITY COMPANY

86.    Defendant DTE Energy, at all times relevant herein, had total and complete control over DTEPN such that the separate personalities and entity existence did not and does not exist with respect to RACER and the Associated Agreements.   DTEPN had no separate mind, will or existence of its own. Specifically:

a.    DTE Energy owns 100% of the membership interests in DTEPN;

b.    There is a complete identity of membership and management of DTEPN and DTE Energy;

c.    Upon information and belief, all personnel providing services at the Leased Premises and Powerhouse were employees of DTE Energy;

d.    Upon information and belief, DTEPN was not adequately capitalized by DTE Energy with respect to the conduct of operations required at the Leased Premises and Facility;

e.    DTE Energy used DTEPN as a mere shell or conduit in conjunction with the performance of all obligations under the Associated Agreements;

f.    Upon information and belief, DTEPN funneled to DTE Energy monies it received during the course of the Associated

Agreements' effectiveness, as well as distributions from GM's bankruptcy estate on account of the Proof of Claim;

g.   Upon information and belief, DTEPN is undercapitalized and insolvent;

h.   Upon information and belief, DTEPN's financial statements show it had no funding; and

i.   All correspondence, communications and meetings with respect to the Associated Agreements were with officers and employees of DTE Energy;

87.   From 2011 through January of 2017, virtually all marketing efforts to sell and consideration to convert the Powerhouse to a bio-mass or solar facility, described at Paragraph 56 above, were conducted by DTE Energy.

88.   It was not until after the expiration of the Lease that DTEPN and DTE Energy informed the Plaintiffs that they had purportedly earlier terminated the Associated Agreements. See Correspondence dated January 10, 2017, Exhibit P.

89.   It was DTE Energy's decision to remain in exclusive possession of the Leased Premises and Powerhouse for the term of the Lease, as well as the decision to cease maintenance and allow the operational and overall condition of the Powerhouse and Leased Premises to deteriorate.

90.     In fact, there was no separation of "corporate identity" between DTEPN and DTE Energy in connection with the performance and breach of obligations under the Associated Agreements, as well as other agreements and interactions with RACER.

91.     All communications regarding the Leased Premises and Powerhouse were between RACER and DTE Energy and its officers and employees.

92.     From March 31, 2011 through January 10, 2017, DTE Energy, through its actions and communications with RACER, represented that it was continuing to occupy the Leased Premises and Powerhouse pursuant to the Associated Agreements, including the Lease and Utility Services Agreement.  In fact, DTE Energy significantly limited access or refused to allow Plaintiffs and its representatives onto the Leased Premises until the end of the Lease's natural expiration in January 2017.

93.     The aforesaid representations and/or omissions of DTE Energy intentionally misled Plaintiffs and left behind the Leased Premises and Powerhouse in a state of deterioration and disrepair with environmental hazards, taking the position that only its shell (DTEPN) was responsible, thereby defrauding the Plaintiffs.

94.     DTEPN is a mere instrumentality and façade for the operations and business activities of DTE Energy related and with respect to RACER and the Associated Agreements.

95.     The control and decisions of DTE Energy resulted in the wrongful and fraudulent conduct, as set forth in this Complaint, by its instrumentality, DTEPN.

96.     DTE Energy used its shell, DTEPN, to avoid its obligations under the Parental Guaranty and to defraud Plaintiffs into believing that DTEPN was occupying the Leased Premises pursuant to all the Associated Agreements.

97.     As a result of DTEPN's wrongful and/or fraudulent conduct, RACER has suffered damages and loss of value to the Leased Premises and Powerhouse.

98.     It would be inequitable to allow DTE Energy to avoid direct liability for the damages suffered by RACER as set forth herein, and the limited liability protection of DTE Energy should be disregarded.

## **DTEPN AND DTE ENERGY HOLDOVER**

99.     Irrespective of a termination of the Lease, DTEPN and DTE Energy were holdover tenants/occupants at the Leased Premises.

100.    Pursuant to the terms of the Lease, DTEPN and DTE Energy were, as such, "subject to every other term, covenant and condition contained in this Lease." See Lease, § 17.13, Exhibit A.

101.   DTEPN and DTE Energy, during their holdover period through January 10, 2017:

a.   Refused and/or improperly limited RACER's access/entry to the Leased Premises and the Powerhouse after reasonable request and notice;

b.   Failed to maintain and repair the Powerhouse;

c.   Failed to properly maintain the Powerhouse in accordance with environmental laws, by, at least: (i) failing to maintain the lead paint and any asbestos-containing building materials in an intact and non-degraded condition; (ii) failing to maintain, store, and dispose of hazardous materials, including liquid industrial wastes and/or by-products, present in containers and building components or building systems; (iii) failing to cleanup, contain, remediate, and/or remove environmentally-hazardous materials, such as the lead paint chips, the remaining deteriorating asbestos-containing pipe and boiler insulation and friable asbestos-containing materials that have fallen to the floor, as well as the liquid industrial wastes and/or by-products; (iv) exacerbating existing environmental conditions; and (v) failing to prevent

and/or allowing the release and threatened release of hazardous materials into the environment;

d.     Failed to remove from the Leased Premises any portion of the Powerhouse and any other equipment and personal property owned by DTEPN or parties other than RACER;

e.     Failed to keep the Powerhouse and Leased Premises in good order, condition, and repair, casualty and reasonable wear and tear excepted, and returning the Site to the same condition as was present on the Commencement Date, casualty and ordinary wear and tear excepted;

f.     Failed to comply promptly with all "Applicable Laws and Permits in effect" regulating the use of the Leased Premises or Leased Premises and Powerhouse;

g.     Failed to act as reasonably necessary to prevent or terminate waste arising out of their use of the Leased Premises and Powerhouse causing degradation of and irreparable harm to these assets; and

h.     Committed waste on the Leased Premises by, among other things, allowing the lead paint and asbestos to degrade and to be disposed, discharged and released in, on, and around the

33

Powerhouse and abandoning said condition(s) on the Leased Premises.

102.   RACER had no obligations to DTEPN nor DTE Energy during their occupation of the Leased Premises.

103.   By virtue of DTEPN's and DTE Energy's occupation of the Leased Premises, RACER reasonably relied on the belief that DTEPN and DTE Energy were maintaining the Leased Premises.

<u>COUNT I</u>
<u>BREACH OF GUARANTY</u>

104.   RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

105.   As noted above, DTE Energy executed the Guaranty.

106.   RACER is the successor to GM as it relates to the Leased Premises, the Associated Agreements, and the Guaranty.

107.   On January 6, 2017, RACER made written demand on DTEPN to perform its obligations under the Associated Agreements, including the Utility Services Agreement. <u>See</u> January 6, 2017 correspondence, <u>Exhibit O</u>.

108.   RACER has also made written demand on DTE Energy to perform its Obligations (as defined in the Guaranty.) ***Id***.

109. Despite demand by RACER, DTE Energy has failed to perform its Obligations (as defined in the Guaranty) as set forth in this Complaint.

110. DTE Energy has breached the Guaranty by failing to perform and comply with all of the obligations, covenants, terms, and conditions to be performed or complied with by DTEPN under the Associated Agreements, including the Utility Services Agreement.

111. As a direct and proximate result of DTE Energy's breach of the Guaranty, RACER has been damaged in an amount in excess of $75,000.

WHEREFORE, RACER requests that this Honorable Court enter a judgment in favor of RACER and against DTE Energy and order DTE Energy to: (i) pay RACER's actual damages, at least those incurred prior to March 31, 2011; (ii) pay the costs of this action, including reasonable attorneys' fees incurred by RACER; (iii) order DTEPN to specifically perform under the Associated Agreements, including but not limited to, removing from the Leased Premises any portion of the Powerhouse and any other equipment and personal property therein owned by DTEPN or parties other than RACER; (iv) return the Site to the same condition as was present on the Lease Commencement Date, casualty and ordinary wear and tear excepted; and (v) such other and further relief as this Honorable Court deems equitable and just.

## COUNT II - QUANTUM MERUIT

112.   RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

113.   DTEPN and DTE Energy have received the benefit of the exclusive use, occupancy, and possession of the Leased Premises since January 10, 2007, through and including January 10, 2017.

114.   During RACER's ownership of the Leased Premises, DTEPN and DTE Energy have failed to pay any rent to RACER for their exclusive use, occupancy, and possession of the Leased Premises.

115.   As a result, DTEPN and DTE Energy have received a benefit for their exclusive use, occupancy, and possession of the Leased Premises without compensation for the same to RACER.

116.   DTEPN's and DTE Energy's wrongful retention of this benefit is unjust and inadequate, absent reasonable compensation to RACER.

117.   RACER is equitably entitled to recover the unpaid fair market rental value of the Leased Premises from March 31, 2011[4], through the date DTEPN and DTE Energy properly vacate and surrender the Leased Premises, in an amount more than $75,000, plus interest as may accrue by statute and/or court rule.

---

[4] The Effective Date of the Confirmation Order.

36

WHEREFORE, RACER respectfully requests that this Honorable Court enter a judgment in favor of RACER and against DTEPN and DTE Energy, jointly and severally, in an amount in excess of $75,000, together with RACER's costs, attorney's fees, interest, and such other and further relief as this Honorable Court deems equitable and just.

## COUNT III - NUISANCE

118. RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

119. RACER is the owner of the Leased Premises.

120. DTEPN is the owner and operator of the Powerhouse.

121. DTEPN and DTE Energy were in exclusive control and possession of the Leased Premises and Powerhouse from at least January 10, 2007, through January 10, 2017.

122. DTEPN and DTE Energy have created or allowed to be created a nuisance, in violation of MCL § 600.2940, through the disposal, discharge, spilling, dumping, abandonment, releases and/or threatened releases of lead paint, friable asbestos, and other hazardous materials and/or substances at the Leased Premises and/or Powerhouse as a result of DTEPN's actions or inaction during its exclusive use, occupancy, and possession of the Powerhouse which have contaminated the

Leased Premises and may constitute an imminent threat of harm to human health, safety, and the environment and are in violation of applicable laws.

123. As a result of the nuisance created by DTEPN and DTE Energy at the Leased Premises and Powerhouse, RACER has suffered and will continue to suffer damages, including diminution of value to the Leased Premises and the Powerhouse and costs related to inspecting, evaluating, cleaning-up, and/or abating releases of hazardous substances that threaten human health, safety and the environment, and other damages that flow naturally and consequentially from DTEPN's actions.

124. Consistent with DTEPN, DTE Energy has either directly engaged in the wrongful and/or fraudulent activities alleged herein or caused its instrumentality, DTEPN, to engage in these activities.

125. DTE Energy, pursuant to the Guaranty of DTEPN's obligations under §11.11 of the Utility Services Agreement, is likewise liable for damages suffered by RACER, at least those damages suffered prior to March 31, 2011.

WHEREFORE, RACER respectfully requests that this Honorable Court enter a judgment in favor of RACER and against DTEPN and DTE Energy in an amount in excess of $75,000, together with such other and further relief as this Honorable Court deems equitable and just.

## <u>COUNT IV - NEGLIGENCE</u>

126.   RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

127.   DTEPN and DTE Energy were negligent in failing to exercise due care in their operation and maintenance of the Leased Premises and of the Powerhouse.

128.   DTEPN and DTE Energy owed various duties to RACER, including but not limited to: (i) reasonably maintaining the Leased Premises; (ii) reasonably maintaining the Powerhouse in an intact and non-degraded condition; (iii) not allowing the Leased Premises and/or Powerhouse to become contaminated and preventing threatened releases of hazardous substances; and (iv) not allowing the exacerbation of contamination at the Leased Premises and/or Powerhouse.

129.   DTEPN and DTE Energy have breached their duties to RACER, including but not limited to:

    a.    By refusing and/or improperly limiting RACER's access/entry to the Leased Premises and the Powerhouse after reasonable request and notice;

    b.    By failing to maintain and repair the Powerhouse in accordance with an express schedule of "Facility Maintenance";

    c.    By failing to operate, repair and maintain the Powerhouse as required under the Associated Agreements;

d.      By failing to remove from the Leased Premises any portion of the Powerhouse and any other equipment and personal property owned by DTEPN or parties other than RACER;

e.      By failing to keep the Powerhouse and Leased Premises in good order, condition, and repair, casualty and reasonable wear and tear excepted, and returning the Site to the same condition as was present on the Commencement Date, casualty and ordinary wear and tear excepted;

f.      By failing to comply promptly with all "Applicable Laws and Permits in effect" regulating the use of the Leased Premises or Leased Premises and Powerhouse pursuant to §5.3 of the Lease;

h.      By failing to act as reasonably necessary to prevent or terminate waste arising out of DTEPN's use of the Leased Premises and Powerhouse causing degradation of and irreparable harm to these assets; and

i.      By committing waste on the Leased Premises contrary to Lease §5.5, among other things, (i) by failing to maintain and allowing the lead paint and any asbestos-containing building materials to degrade and to be disposed, discharged and released in, on, and around the Powerhouse and abandoning said condition(s) on the

Leased Premises; (ii) by failing to maintain, store, and dispose of hazardous materials, including liquid industrial wastes and/or by-products, present in containers and building components or building systems; (iii) by failing to cleanup, contain, remediate, and/or remove environmentally hazardous materials, such as lead paint chips and sheets, the remaining deteriorating asbestos-containing insulation pipe and boiler insulation and exposed friable asbestos-containing materials that have fallen to the floor, as well as the liquid industrial wastes and/or by-products; (iv) by exacerbating existing environmental conditions; and (v) by failing to prevent the release, and/or allowing the release and threatened release of, hazardous materials into the environment.

130. All of the foregoing was a result of DTE Energy acting for its own benefit and/or a result of it causing its shell entity, DTEPN, to wrongfully act.

131. Consistent with DTEPN, DTE Energy has either directly engaged in the wrongful and/or fraudulent activities allege herein or caused its instrumentality, DTEPN, to engage in these activities;

132. As a direct and proximate cause of DTEPN's and DTE Energy's breach(es) of duties, RACER has suffered damages in an amount in excess of $75,000.

WHEREFORE, RACER requests that this Honorable Court enter a judgment in favor of RACER and against DTEPN, in an amount in excess of $75,000, together with such other and further relief as this Honorable Court deems equitable and just.

## COUNT V - STATUTORY WASTE PURSUANT TO MCL § 600.2919

133.   RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

134.   DTEPN and DTE Energy have committed and/or suffered to be committed waste upon the Leased Premises, through the disposal, discharge, spilling, dumping, abandonment, releases and/or threatened releases of lead paint, friable asbestos, and other hazardous materials and/or substances in the Powerhouse and ultimately on the Leased Premises, in breach of the Associated Agreements and applicable laws, and without concern for human health, safety, and the environment

135.   DTEPN and DTE Energy have committed and/or suffered to be committed waste upon the Powerhouse building structure and equipment, including but not limited to performing only minimal or no maintenance, causing it to degrade to a point at which such structure and equipment are worthless and causing RACER to incur costs related to inspecting, evaluating, cleaning-up, and/or abating releases of hazardous substances that threaten human health, safety, and the environment.

136.   Pursuant to MCL § 600.2919, as a result of is conduct, actions, and failure to act, DTEPN and DTE Energy are liable to RACER for double its actual

damages, in an amount more than $75,000, plus interest as may accrue by statute and/or court rule.

137.   DTEPN's and DTE Energy's waste is of a continuing nature and there is not a plain, adequate, and complete remedy provided by money damages alone. Therefore, an injunction against DTEPN and DTE Energy to prevent further and/or continuing waste at the Leased Premises and Powerhouse is appropriate pursuant to MCL § 600.2919(3).

138.   Consistent with DTEPN, DTE Energy has either directly engaged in the wrongful and/or fraudulent activities alleged herein or caused its instrumentality, DTEPN, to engage in these activities.

139.   DTE Energy, pursuant to the Guaranty of DTEPN's obligations under Section 11.11 of the Utility Services Agreement, is likewise liable for damages suffered by RACER, at least those suffered prior to March 31, 2011.

WHEREFORE, RACER respectfully requests that this Honorable Court: (i) enter a judgment in favor of RACER and against DTEPN and DTE Energy in an amount in excess of $75,000, including double RACER's actual damages; and (ii) and for such other and further relief this Honorable Court deems equitable and just.

## COUNT VI - VIOLATION OF AND RECOVERY OF RESPONSE COSTS UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT ("CERCLA"), 42 U.S.C. §9601, *et seq.*

140.   RACER restates and incorporates by reference the preceding paragraphs of this Complaint as though the same were fully set forth herein.

141.   As set forth above, at all times relevant hereto, RACER has been the owner of the Leased Premises (which does not include the Powerhouse) while DTEPN and DTE Energy have had exclusive possession of the Leased Premises, and DTEPN or DTE Energy has/have been the owner and operator of the Powerhouse and other equipment and personal property owned by DTEPN or parties other than RACER, which are located on the Leased Premises.

142.   DTEPN has taken the position that it is permitted to and has abandoned the Powerhouse and other equipment and personal property owned by DTEPN or parties other than RACER, which are located on the Leased Premises.

143.   Certain hazardous substances, within the meaning of CERCLA §101(14), 42 U.S.C § 9601(14), including but not limited to lead paint chips, sheets of lead paint,  friable asbestos, and hazardous substance-containing industrial wastes and/or by-products have been disposed, discharged, spilled, dumped, and/or abandoned within the Powerhouse; and have been released and/or pose a threat of release to the environment during DTEPN's purported operation and ownership thereof; and are a direct result of DTEPN's actions or inactions, directed and caused

by DTE Energy, in failing to properly maintain, remove, dispose, and/or cleanup the industrial wastes and/or by-products, lead paint, and friable asbestos that is scattered on the ground in portions of the building and exposed on various building systems and structures.

144.   The condition of the building has allowed hazardous substances, disposed, discharged, abandoned, and/or released in the Powerhouse to escape to the exterior environment and to present a continuing threat of release to the public and environment.

145.   The past and on-going disposal, discharge, spilling, dumping and/or abandonment of these hazardous substances within the Powerhouse constitutes "releases" or "threats of releases" within the meaning of CERCLA §§ 101(22) and 107(a), 42 U.S.C §§ 9601(22) and 9607(a).   These releases and threats of releases within the Powerhouse also constitute a threat of release to the environment as that term is defined by CERCLA §101(8).

146.   CERCLA § 101(9), 42 U.S.C § 9601(9), defines a "facility" as: "(A) any building, structure, installation, equipment, pipe or pipeline…. or (B) any site or area where a hazardous substance has been deposited, stored, disposed or, or placed, or otherwise come to be located…."   As a result of the releases and threatened releases of the hazardous substances, the Leased Premises and the Powerhouse are a "facility" within the meaning and scope of CERCLA.

147.   RACER has incurred costs related to taking response actions within the meaning of CERCLA §§101(24) and 101(25), 42 U.S.C §§9601(24) and (25), including but not limited to, costs related to:  (a) inspecting and evaluating the hazardous substances disposed, discharged, spilled, dumped and/or abandoned in the Powerhouse and threat of release resulting therefrom, (b) securing the Site to prevent access to and contact with the hazardous substance releases and threatened releases in the Powerhouse and Leased Premises, (c) reviewing and evaluating transactional documents related to DTEPN's and DTE Energy's obligations to cleanup the hazardous substances for purposes of identifying DTEPN and DTE Energy as the responsible parties, and (d) evaluating the cleanup, remediation, removal and/or abatement of the releases and/or threatened releases of hazardous substances. RACER will continue to take response actions and incur costs related thereto in connection with the hazardous substances located in the Powerhouse at the Leased Premises.

148.   CERCLA §107(a), 42 U.S.C. §9607(a), imposes liability for past and future releases and threatened releases of hazardous substances at a CERCLA "facility".  That Section provides in pertinent part:

* * * *

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of

\* \* \* \*

from which there is a release, or a threatened release which causes the incurrence of response costs, or a hazardous substance, shall be liable for -

\* \* \* \*

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

149.   As the owner and operator of the Powerhouse, DTEPN is an owner and operator under CERCLA 107(a) (as those terms are defined by CERCLA §101(20)(A), 42 U.S.C. § 9601(20)(A)) of a CERCLA "facility".

150.   RACER has incurred, and will continue to incur, costs associated with response actions as that is defined by CERCLA §§101(24) and (25), 42 U.S.C. §§9601(24) and (25).

151.   The response costs incurred by RACER are consistent with the National Contingency Plan (40 C.F.R. Part 300 *et seq.*).

152.   Pursuant to CERCLA Section 107(a)(1-3), RACER requests that this Honorable Court find that DTEPN and DTE Energy are liable to RACER for the

response costs that RACER has incurred to date and will incur, including all interest related thereto, on the CERCLA "facility."

153. RACER has incurred and will continue to incur response costs recoverable under CERCLA Section 107(a) related to the cleanup and removal of hazardous substances on the CERCLA "facility."

154. This Honorable Court has the authority to enter a declaratory judgment regarding a responsible party's liability for future response costs pursuant to CERCLA §113(g)(2), 42 U.S.C §9613(G)(2).

155. RACER requests that this Court enter an order granting declaratory relief that DTEPN and DTE Energy are liable to RACER for any future response costs incurred by RACER related to the Leased Premises.

156. Consistent with DTEPN, DTE Energy has either directly engaged in the wrongful and/or fraudulent activities alleged herein or caused its instrumentality, DTEPN, to engage in these activities.

157. DTE Energy, pursuant to the Guaranty of DTEPN's obligations under Section 11.11 of the Utility Services Agreement, is likewise liable for damages suffered by RACER, at least those incurred prior to March 31, 2011.

WHEREFORE, RACER respectfully requests that this Honorable Court grant a judgment in favor of RACER and against DTEPN and DTE Energy: (i) in an amount in excess of $75,000 and equal to the response costs, including all interests

related thereto, to remediate the Leased Premises and the Powerhouse; (ii) that

DTEPN and DTE Energy are liable to RACER for any future response costs incurred

by RACER related to the Leased Premises; and (iii) such other and further relief as

this Honorable Court deems equitable and just, together with all other relief to which

RACER is entitled in law or equity.

## COUNT VII - VIOLATION OF AND RECOVERY UNDER THE STATE OF MICHIGAN NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT, § 324.20101, *et seq* ("Part 201").

158. RACER restates and incorporates by reference the preceding

paragraphs of this Complaint as though the same were fully set forth herein.

159. DTEPN's actions and/or inactions relating to the lead paint and

asbestos, including but not limited to DTEPN's failure to properly maintain, remove

and/or cleanup the lead paint chips and sheets and friable asbestos scattered on the

floor of the Powerhouse, have resulted in a release and threatened release and

disposal of hazardous substances on the Leased Premises.

160. The lead paint and friable asbestos identified herein, and any other

hazardous wastes, which have been disposed, discharged, spilled, dumped and/or

abandoned within the Powerhouse at the Leased Premises during DTEPN's

operation and ownership thereof constitute "hazardous substances" as defined by

MCL § 324.20101(1)(x).

161.   The past and on-going disposal, discharge, dumping, spilling, dumping and/or abandonment of these hazardous substances within the Powerhouse constitutes a "disposal", "release" or a "threat of release" within the meaning of MCL § 324.20101(1)(m), (pp) and (ccc).  These disposals, releases, and threatened releases within the Powerhouse also have resulted in disposals, releases, and a threatened release to the air, land, and/or water on or about the Powerhouse and Leased Premises.

162.   The hazardous substances disposed, released and/or constituting a threatened release within the Powerhouse and at the Leased Premises are present on an "…area, place…. or portion of a parcel….at levels in excess of the concentrations that satisfy the cleanup criteria for unrestricted residential use…" and, therefore, the Powerhouse and the Leased Premises are each a "facility" under Part 201 as that term is defined by MCL § 324.20101(1)(s).

163.   DTEPN was and is the owner of the Powerhouse and therefore, is the "owner" as defined by MCL § 324.20101(1)(kk). As the entity that was and/or is in control of and/or responsible for the operation of the Powerhouse and Leased Premises, DTEPN is also the "operator" as defined by MCL § 324.20101(1)(jj).

164.   In addition to the foregoing, as the owner and operator of a Part 201 "facility" (i.e., the Powerhouse), DTEPN was required by MCL § 324.20107a(1)(a) to "undertake measures as are necessary to prevent exacerbation" of the hazardous

substances at the Powerhouse. By allowing the hazardous substances to escape and/or to be disposed, discharged, spilled, dumped and/or abandoned on and about the Powerhouse, DTEPN caused an increase in RACER's response costs, and, thereby an "exacerbation" as that term is defined by MCL § 324.20101(1)(r).

165. The following persons are liable under MCL § 324.20126(1) for releases or threatened releases of hazardous substances at a Part 201 "facility":

> (a) The owner or operator of a facility if the owner or operator is responsible for an activity causing a release or threat of release.

> (b) The owner or operator of a facility at the time of disposal of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.

> * * * *

> (d) A person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by the person, by any other person, at a facility owned or operated by another person and containing the hazardous substance.

166. As set forth in MCL § 324.20126a, a person who is liable under MCL § 324.126(1) is jointly and severally liable for all of the following:

> * * * *

> (b) Any other costs of response activity reasonably incurred under the circumstances by any other person.

> * * * *

51

167.   DTEPN was, and is, the owner and operator of the Powerhouse during the disposal, discharging, spilling, dumping, abandonment, and releasing of the lead paint chips, friable asbestos, industrial wastewater/sludges, and other hazardous substances on or about the Powerhouse and Leased Premises, which created a threat of release.

168.   RACER has incurred response costs related to the releases and threatened releases of hazardous substances on or about the Powerhouse, to wit, costs related to: (a) inspecting and evaluating the hazardous substances disposed, discharged, spilled, dumped, and/or abandoned in, on, or around the Powerhouse and threat of release resulting therefrom; (b) securing the Site to prevent access to and contact with the hazardous substance releases and threatened releases in the Powerhouse and Leased Premises; (c) reviewing and evaluating transactional documents related to DTEPN's and DTE Energy's obligations to cleanup the hazardous substances for purposes of identifying DTEPN and DTE Energy as the responsible parties; and (d) evaluating the cleanup, remediation, removal and/or abatement of the releases and/or threatened releases of hazardous substances. These costs constitute "response activity costs" as defined by MCL § 324.20101(vv) and (ww).

169.   DTEPN is liable pursuant to MCL § 324.20126 and § 324.20126a for the response activity costs RACER has incurred and will incur, including all interest

related thereto and RACER requests that this Court find DTEPN liable for all such costs and interest incurred by RACER.

170.   Consistent with DTEPN, DTE Energy has either directly engaged in the wrongful and/or fraudulent activities alleged herein or caused its instrumentality, DTEPN, to engage in these activities.

171.   DTE Energy, pursuant to the Guaranty of DTEPN's obligations under Section 11.11 of the Utility Services Agreement, is likewise liable for damages suffered by RACER, at least those suffered prior to March 31, 2011.

WHEREFORE, RACER respectfully requests that this Honorable Court grant a judgment in favor of RACER and against DTEPN and DTE Energy in an amount in excess of $75,000 and equal to the response costs, including all interests related thereto, to remediate the Leased Premises, together with all other relief to which RACER is entitled in law or equity.

Respectfully submitted by:

By:  _/s/ Michael V. Blumenthal_
THOMPSON & KNIGHT, PLC
Michael V. Blumenthal
Bruce J. Zabarauskas
900 Third Avenue
New York, New York 10022
(212) 751-3001
Co-Counsel for Plaintiffs
Michael.Blumenthal@tklaw.com
Bruce.Zabarauskas@tklaw.com

By:  _/s/ Alfredo Casab_
DAWDA, MANN, MULCAHY & SADLER, PLC
Frances Belzer Wilson (P68650)
Alfredo Casab (P53699)
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
(248) 642-3700
Co-Counsel for Plaintiffs
fwilson@dmms.com
acasab@dmms.com

Dated: March 26, 2019